**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 11-02758 (CGM) |
| Plaintiff, | **ANSWER TO AMENDED COMPLAINT AND JURY DEMAND** |
| v. | |
| CACEIS BANK LUXEMBOURG and CACEIS BANK, | |
| Defendants. | |

Defendants CACEIS Bank and CACEIS Bank, Luxembourg Branch (the "CACEIS

Entities"), by their undersigned counsel, hereby respond to the Amended Complaint

("Complaint")[1] of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment

---

[1] The Amended Complaint in *Picard v. CACEIS Bank Luxembourg and CACEIS Bank*, Adv. Pro. 11-02758 (Bankr. S.D.N.Y.), ECF No. 1, was filed June 30, 2023. Unless otherwise specified, all "ECF No. __" citations refer to Adv. Pro. No. 11-02758.

Securities LLC and the substantively consolidated estate of Bernard L. Madoff ("Plaintiff" or

"Trustee") as follows:

## PRELIMINARY STATEMENT

Except as otherwise expressly admitted herein, the CACEIS Entities deny each and every

allegation in the Complaint. The CACEIS Entities state that the headings and sub-headings

throughout the Complaint do not constitute well-pleaded allegations of fact and therefore require

no response. To the extent that a response is required, the allegations in the headings and

subheadings in the Complaint are denied. In answering the allegations in the Complaint, the

CACEIS Entities do not intend to waive, and do not waive, any and all applicable objections to

the relevance, admissibility, or prejudicial effect of any of the allegations in the Complaint. The

CACEIS Entities expressly reserve the right to amend and/or supplement this Answer.

## I.    Nature of the Action

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property[2] that BLMIS stole as part of the massive Ponzi scheme perpetrated by
Madoff and others.

**ANSWER:** The allegations in paragraph 1 of the Complaint contain legal conclusions to

which no response is required. To the extent that a response is required, the CACEIS Entities

deny knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 1 and therefore deny those allegations, except that the CACEIS Entities admit that the

---

[2] Footnote 2 in the Complaint alleges that SIPA § 78lll(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

**ANSWER to FN 2:** The CACEIS Entities respectfully refer the Court to the cited statute for its full and correct contents.

Trustee purports to bring this action as trustee for the liquidation of BLMIS[3] and the

substantively consolidated estate of Bernard L. Madoff pursuant to the Securities Investor

Protection Act ("SIPA").

2.      The Trustee seeks to recover at least $77,633,803 of stolen BLMIS customer
property transferred to CACEIS Bank Lux and $33,213,014 of stolen BLMIS customer property
transferred to CACEIS Bank France (collectively, the "Subsequent Transfers") for a total of
$110,846,817, which Subsequent Transfers were transferred to the CACEIS Defendants between
2003 and 2008 (the "Transfer Period"). The Subsequent Transfers were derived from CACEIS
Bank France's and CACEIS Bank Lux's investments with BLMIS through the BLMIS feeder
funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"
and together with Fairfield Sentry, collectively, the "Fairfield Funds"), and Harley International
(Cayman) Limited ("Harley" and together with the Fairfield Funds, collectively, the "BLMIS
Feeder Funds").

ANSWER: The allegations in paragraph 2 of the Complaint contain legal conclusions to

which no response is required. To the extent that a response is required, the CACEIS Entities

deny the allegations in paragraph 2, except that the CACEIS Entities admit on information and

belief that the Trustee seeks to recover approximately $110,846,817 that it alleges were

subsequent transfers from BLMIS Feeder Funds to the CACEIS Entities.

3.      The following chart sets forth the currently known aggregate amounts of the
Subsequent Transfers from the BLMIS Feeder Funds to the specific CACEIS Defendant:

|  | CACEIS Bank France | CACEIS Bank Lux |
|---|---|---|
| **Fairfield Sentry** | $33,213,014 | $35,759,150 |
| **Fairfield Sigma** | N/A | $35,824,693 |
| **Harley** | N/A | $6,049,960 |
| **Total** | **$33,213,014** | **$77,633,803** |

ANSWER: The CACEIS Entities deny the allegations in paragraph 3 of the Complaint.

---

[3] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Complaint.

II.   **Subject Matter Jurisdiction and Venue**

4.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA Liquidation proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Liquidation Proceeding"), is pending. The SIPA Liquidation Proceeding was originally brought in the United States District Court for the Southern District of New York as Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al., No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**ANSWER:** The allegations in paragraph 4 contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 4, except that the CACEIS entities deny knowledge or information sufficient to form a belief as to where the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789 (CGM)) was originally brought, and the CACEIS Entities admit that: (i) the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789 (CGM)) is pending in this Court; and (ii) this is an adversary proceeding pending in this Court.

5.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:** The allegations in paragraph 5 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 5, state that they do not consent to the issuance or entry of final orders or judgment by this Court, and demand a trial by jury of all issues that may be tried by a jury.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:** The allegations in paragraph 6 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities

deny knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 6 and therefore deny those allegations.

    7.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3),
11 U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER:** The allegations in paragraph 7 of the Complaint contain legal conclusions to

which no response is required. To the extent that a response is required, the CACEIS Entities

deny the allegations in paragraph 7, except the CACEIS Entities admit that the Trustee has

brought this adversary proceeding, purportedly pursuant to the cited statutes.

III.    **Background, the Trustee, and Standing**

    8.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for criminal violations of federal securities laws, including securities fraud, investment adviser
fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission
(the "SEC") commenced the District Court Proceeding.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 8 of the Complaint and therefore deny those

allegations, except that the CACEIS Entities admit on information and belief that Madoff was

arrested on or about December 11, 2008 and that the SEC filed a complaint against Madoff and

BLMIS on or about December 11, 2008.

    9.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to
combining its action with an application by the Securities Investor Protection Corporation
("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court
alleging, among other things, that BLMIS could not meet its obligations to securities customers as
they came due and its customers needed the protections afforded by SIPA.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 9 of the Complaint and therefore deny those

allegations, and respectfully refer the Court to the referenced application for a complete and

accurate statement of its contents.

10.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore deny those allegations, and respectfully refer the Court to the referenced order for a complete and accurate statement of its contents.

11.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore deny those allegations, and respectfully refer the Court to the referenced orders for a complete and accurate statement of their contents.

12.    On April 13, 2009, certain creditors filed an involuntary bankruptcy petition against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Liquidation Proceeding.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore deny those allegations.

13.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint and therefore deny those allegations, except admit, on information and belief, that Madoff pled guilty to crimes and was sentenced to prison. The CACEIS Entities respectfully refer the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

14.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore deny those allegations, and respectfully refer the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

15.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore deny those allegations, and respectfully refer the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

16.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore deny those allegations.

17.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee relies on SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:** The allegations in paragraph 17 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 and therefore deny those allegations.

18.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER:** The allegations in paragraph 18 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 and therefore deny those allegations.

19.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1) of the Bankruptcy Code, because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 19 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities

deny knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 19 and therefore deny those allegations.

IV.     **BLMIS, the Ponzi Scheme, and Madoff's Investment Strategy**

     **A. BLMIS**

20.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a
broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole
proprietorship to a New York limited liability company. At all relevant times, Madoff controlled
BLMIS first as its sole member, and thereafter as its chairman and chief executive.

     **ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore deny those

allegations.

21.     In compliance with SIPA § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its
business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records
obtained from the Central Registration Depository of the Financial Industry Regulatory
Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its
operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management
System database also reflects BLMIS's registration with the SEC as a securities broker-dealer
beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC upon
SIPA's creation and continued its membership after 2001 without any change in status. SIPC
membership is contingent on registration of the broker-dealer with the SEC.

     **ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 21 of the Complaint and therefore deny those

allegations.

22.     For most of its existence, BLMIS's principal place of business was 885 Third
Avenue in New York City, where Madoff operated three principal business units: a
proprietary trading desk, a broker dealer operation, and the investment advisory business
("IA Business").

     **ANSWER**: The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 22 of the Complaint and therefore deny those

allegations.

23.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore deny those

allegations.

24.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore deny those

allegations.

25.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 25 of the Complaint and therefore deny those

allegations.

**B.    The Ponzi Scheme**

26.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore deny those allegations.

27.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore deny those allegations.

28.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore deny those allegations.

29.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore deny those allegations.

### C. Madoff's Investment Strategy

30.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore deny those

allegations.

31.     BLMIS commingled all funds received from its customers into a single BLMIS account maintained at JPMorgan Chase Bank. BLMIS did not use these commingled funds to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 31 of the Complaint and therefore deny those

allegations.

32.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s, this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore deny those

allegations.

33.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore deny those

allegations.

34.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 34 of the Complaint and therefore deny those

allegations.

35.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 35 of the Complaint and therefore deny those

allegations.

36.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 36 of the Complaint and therefore deny those

allegations.

37.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Complaint and therefore deny those allegations.

38.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protections while limiting the upside.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Complaint and therefore deny those allegations.

39.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 of the Complaint and therefore deny those allegations.

40.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the SSC Strategy.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 of the Complaint and therefore deny those allegations.

41.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at

times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 of the Complaint and therefore deny those allegations.

### 1.    BLMIS's Fee Structure

42.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint and therefore deny those allegations.

### 2.    BLMIS's Market Timing

43.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("U.S. Treasury Bills") or mutual funds invested in U.S. Treasury Bills.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint and therefore deny those allegations.

44.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet, this is precisely what BLMIS's customer statements reported.

**ANSWER:** The allegations in the first sentence of paragraph 44 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 44 and therefore deny those allegations. The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 44 of the Complaint and therefore deny those allegations.

45.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45 of the Complaint and therefore deny those allegations.

### 3.    BLMIS Execution

46.    BLMIS's execution, as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Complaint and therefore deny those allegations.

### 4.    No Evidence of BLMIS Trading

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 47 of the Complaint and therefore deny those

allegations.

48.      All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 48 of the Complaint and therefore deny those

allegations.

### 5.      The Collapse of the Ponzi Scheme

49.      The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 49 of the Complaint and therefore deny those

allegations.

50.      At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 50 of the Complaint and therefore deny those

allegations, and respectfully refer the Court to the transcript of the referenced plea hearing for a

complete and accurate statement of its contents.

51.      At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the Subsequent Transfers, BLMIS was left with insufficient capital.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Complaint and therefore deny those allegations.

V.    **The Defendants, Their Predecessors, and Non-Parties**

52.    Defendant CACEIS Bank France is a French *societe anonyme* maintaining a place of business at 1-3, place Valhubert, 75206 Paris Cedex 13, France. Defendant CACEIS Bank France was formed in 2005 as a joint venture comprised of Credit Agricole Investor Services Bank and IXIS Investor Services.

**ANSWER:** The CACEIS Entities deny the allegations in the first sentence of paragraph 52, except the CACEIS Entities admit that CACEIS Bank is a French *societe anonyme*. CACEIS Bank maintains its place of business at 12, place des Etats-Unis CS 40083 – 92549 Montrouge Cedex, France. The CACEIS Entities admit that CACEIS Bank was formed in 2005 as a joint venture comprised of Credit Agricole Investor Services Bank and IXIS Investor Services.

53.    Defendant CACEIS Bank Lux is a Luxembourg *societe anonyme* maintaining a place of business at 5 allèe Schaffer, L-2520 Luxembourg. During the Transfer Period, CACEIS Bank Lux was a wholly owned subsidiary of CACEIS Bank France.

**ANSWER:** The CACEIS Entities deny the allegations in the first sentence of paragraph 53, except the CACEIS Entities admit that CACEIS Bank, Luxembourg Branch is a Luxembourg *societe anonyme*. CACEIS Bank, Luxembourg Branch maintains its place of business at 5 Allée Scheffer L-2520 Luxembourg. The CACEIS Entities admit that CACEIS Bank, Luxembourg Branch was a wholly owned subsidiary of CACEIS Bank between 2003 and 2008.

54.    At all relevant times, both CACEIS Bank France and CACEIS Bank Lux were sophisticated global financial institutions with experience and expertise in providing professional investment management and financial services to corporations, institutions, and high net worth individuals. In publicly available documents available at the time the Trustee filed the original Complaint, the CACEIS Defendants held themselves out as custodian banks. *See* **Exhibit A**. That same document, however, also provided that CACEIS, through offices across Europe, North America, and Asia, delivered a comprehensive set of high quality services covering depository/trustee and custody, clearing, fund administration, transfer agency, and corporate trust. *Id.* CACEIS also provided (i) qualitative analysis for the growing information needs

associated with the diversification of investment strategies and the increasing complexity of financial instruments, (ii) value-at-risk risk analysis, and (iii) performance attribute and measurement services. *Id*. A similar, current document states that CACEIS is engaged in providing (i) global and cross-asset market solutions, (ii) middle-office services, (iii) custody and cash services, (iv) asset administration and accounting services, and (v) reporting services. *See* **Exhibit B**.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 54 of the Complaint.

The CACEIS Entities respectfully refer the Court to Exhibits A and B for a complete and

accurate statement of their contents.

55.     The Fairfield Funds were single-purpose investment vehicles, created, operated, marketed, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York that solicited funds from third parties for investment with BLMIS.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 55 of the Complaint and therefore deny those

allegations.

56.     Non-party Fairfield Sentry, a BVI company, was an investment fund that had direct customer accounts with BLMIS's IA Business for the purpose of investing all or substantially all of its assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in its BLMIS customer accounts. Certain of the Subsequent Transfers from Fairfield Sentry came through non-party Fairfield Sigma, also a BVI company, which is a foreign currency fund that invested 100% of its assets in Fairfield Sentry.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 56 of the Complaint and therefore deny those

allegations, except admits on information and belief that Fairfield Sentry and Fairfield Sigma are

BVI companies.

57.     Non-party Harley, a Cayman Islands company, was a BLMIS feeder fund formed in the Cayman Islands. Harley invested all or substantially all of its assets with BLMIS in New York. In 2009, the Trustee filed an adversary proceeding against Harley in this Court, seeking to avoid and recover initial transfers of customer property from BLMIS to Harley. On November 10, 2010, on a motion for summary default judgment, the Court entered a default judgment against Harley avoiding the initial transfers. The Trustee has not recovered any of the initial transfers or their value avoided by the default judgment against Harley.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 of the Complaint and therefore deny those allegations, except admits on information and belief that Harley is a Cayman Islands company, and respectfully refer the Court to the referenced judgment for a complete and accurate statement of its contents.

VI.    **Personal Jurisdiction**

58.    Both CACEIS Bank Lux and CACEIS Bank France are subject to personal jurisdiction in this judicial district because each purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Fairfield Funds, which were created, operated, and controlled by New York-based FGG. CACEIS Bank Lux also knowingly directed funds to be invested with New York-based BLMIS through New York-based Harley. By directing investments through the BLMIS Feeder Funds and relinquishing control over investment decisions and their implementation to Madoff in New York, both CACEIS Bank France and CACEIS Bank Lux knowingly accepted the rights, benefits, and privileges of conducting business in New York.

**ANSWER:** The allegations in paragraph 58 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations of paragraph 58.

59.    Upon information and belief, FGG maintained New York-based agents dedicated to both CACEIS Bank France and CACEIS Bank Lux.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore deny those allegations.

60.    CACEIS Bank France and, upon information and belief, CACEIS Bank Lux, communicated directly with the above-referenced New York-based agents regarding their respective investments, subscriptions, and redemptions from the Fairfield Funds.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 60 of the Complaint.

61.    Both CACEIS Bank Lux and CACEIS Bank France voluntarily entered into at least seven (7) subscription agreements with Fairfield Sentry between July 2004 and July 2007 under which they submitted to New York jurisdiction, sent copies of the subscription agreements

to FGG's New York City office, and wired funds to Fairfield Sentry through a designated bank in New York.

**ANSWER:** The allegations in paragraph 61 of the Complaint contain legal conclusions

to which no response is required. To the extent that a response is required, the CACEIS Entities

deny the allegations of paragraph 61. The CACEIS Entities deny the remaining allegations in

paragraph 61.

62.     CACEIS Bank Lux also entered into at least four (4) subscription agreements with Fairfield Sigma between December 2006 and March 2008. The Fairfield Sigma information memo or Private Placement Memoranda in place during these respective subscriptions (the "Fairfield Sigma PPM") provides, in relevant part, that "In order to subscribe for Shares, subscribers **must** complete and sign the Share Application Form included in the Subscription Documents which accompany this Memorandum . . . ." The Subscription Agreement attached to the Fairfield Sigma PPM includes the same provisions as the Fairfield Sentry subscription agreements, requiring CACEIS Bank Lux to submit to New York jurisdiction, venue, and choice of law provisions.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 62 of the Complaint.

63.     CACEIS Bank Lux and CACEIS Bank France representatives executed these subscription agreements, and as explained more fully below, identified New York bank accounts held in CACEIS Bank Lux's and CACEIS Bank France's own names to receive redemptions from the Fairfield Funds.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 63 of the Complaint.

64.     The Private Placement Memoranda issued over time for Fairfield Sentry (each a "Fairfield Sentry PPM" and together with the Fairfield Sigma PPM, the "PPMs") contains the same information and representations as the Fairfield Sigma PPM.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 64 of the Complaint.

65.     Each time CACEIS Bank Lux and CACEIS Bank France invested in Fairfield Sentry, and each time CACEIS Bank Lux invested in Fairfield Sigma, they were required to sign a subscription agreement through which they submitted to venue in New York, the jurisdiction of New York courts, the service of process out of New York courts, and the application of New York law. Upon information and belief, CACEIS Bank Lux and CACEIS Bank France signed the required subscription agreements each time they invested with the Fairfield Funds. Both CACEIS Bank France and CACEIS Bank Lux (i) "agree[d] that any suit, action or proceeding. with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii)

"consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

      **ANSWER:** The CACEIS Entities deny the allegations in paragraph 65 of the Complaint.

      66.     In the subscription agreements, CACEIS Bank France and CACEIS Bank Lux each affirmed that they received and read the relevant Fairfield Fund's PPM. Based on the subscription agreements and PPMs, both CACEIS Bank France and CACEIS Bank Lux knew that BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry. At least one PPM applicable to both CACEIS Bank France's and CACEIS Bank Lux's investments expressly stated that BLMIS would serve as sub-custodians for certain assets of Fairfield Sentry and that BLMIS held approximately 95% of the fund's assets.

      **ANSWER:** The CACEIS Entities deny the allegations in paragraph 66 of the Complaint.

      67.     Based on the information and representations contained in the PPMs in effect at the time the CACEIS Defendants executed subscription agreements for the Fairfield Funds, CACEIS Bank Lux and CACEIS Bank France knew that BLMIS was the investment advisor and broker-dealer that executed the SSC Strategy for the Fairfield Funds. The PPM explained that FGG "established a discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities, Inc. ('BLM'), a registered broker-dealer in New York, New York, who utilizes a strategy described as 'split strike conversion,'" and that "BLM acts as a principal in connection with its sale of securities to the Company [Fairfield Sentry] and the purchase of securities from the Company."

      **ANSWER:** The CACEIS Entities deny the allegations in paragraph 67 of the Complaint.

      68.     The PPMs further explained that FGG "delegated all investment management duties to Bernard L. Madoff Investment Securities. As a result, the Company [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities."

      **ANSWER:** The CACEIS Entities deny the allegations in paragraph 68 of the Complaint.

      69.     In addition, the PPM explained that "[a]ll investment decisions in the account at BLM are effected by persons associated with BLM," and that "[t]he services of [Bernard L. Madoff Investment Securities] and its personnel are essential to the continued operation of [Fairfield Sentry], and its profitability, if any."

      **ANSWER:** The CACEIS Entities deny the allegations in paragraph 69 of the Complaint.

      70.     At all relevant times, Fairfield Sentry operated from FGG's New York headquarters. FGG's New York personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed

administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 70 and therefore deny those allegations.

71.    Based on the information contained in the PPM, CACEIS Bank Lux and CACEIS Bank France each also knew the following facts indicating that they were transacting business in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma invested 100% of its assets with Fairfield Sentry;
- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on Fairfield Sentry's behalf;
- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury Bills traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;
- BLMIS was registered with the SEC;
- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and
- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 71 of the Complaint.

72.    New York was the specific situs repeatedly selected by both CACEIS Bank France and CACEIS Bank Lux to receive the Subsequent Transfers from the Fairfield Funds. Specifically, CACEIS Bank Lux used correspondent bank accounts at Calyon, New York and Citibank N.Y., which accounts were in CACEIS Bank Lux's own name and/or in the name of its affiliates, to receive redemption payments from Fairfield Sentry. CACEIS Bank France used correspondent bank accounts at Brown Brothers Harriman NY and Bankers Trust New York, which accounts were in CACEIS Bank France's own name, to receive redemption payments from Fairfield Sentry.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 72 of the Complaint.

73.    CACEIS Bank France and CACEIS Bank Lux systematically and purposefully designated the use of these New York bank accounts in their Fairfield Sentry Subscription Agreements and certain redemption documents.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 73 of the Complaint.

74.    The Fairfield Sentry subscription agreements that CACEIS Bank France and
CACEIS Bank Lux executed required direct subscription payments to a HSBC Bank, New York
correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From
Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan
Chase Bank NA in New York.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 74 of the Complaint.

75.    CACEIS Bank Lux and CACEIS Bank France also directed Fairfield Sentry to
send transfers of BLMIS customer property through New York correspondent bank accounts.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 75 of the Complaint.

76.    The Fairfield Sigma PPM states that Fairfield Sigma invested all of its assets in
Fairfield Sentry and provides substantially similar information to that set forth in the Fairfield
Sentry PPM. Moreover, the Fairfield Sigma PPM described the significant role of BLMIS in
New York-based Fairfield Sentry. It also made substantially similar statements regarding
Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in those
investments. In fact, the October 2004 Fairfield Sigma PPM disclosed that because BLMIS was
the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could
misappropriate the assets or securities.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 76 of the Complaint.

77.    Similar to the Fairfield Funds, investment in Harley required each investor to
enter into a subscription agreement (a "Harley Subscription Agreement"), which agreement
acknowledged that such investor received and read Harley's Confidential Explanatory
Memorandum (the "Harley EM").

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 77 of the Complaint.

78.    Based upon the requirement that each investor execute a Harley Subscription
Agreement prior to investment in Harley and upon information and belief, CACEIS Bank Lux
entered into one or more Harley Subscription Agreements.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 78 of the Complaint.

79.    In addition, each investor in Harley, including, upon information and belief,
CACEIS Bank Lux, received copies of Harley's audited yearly financial statements,
Memorandum of Association and Articles of Association.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 79 of the Complaint.

80.    The Harley EM states that Harley "invests its assets with a single money manager
[i.e., BLMIS]. The manager invests primarily in a basket of S&P 100 stocks. The manager also

employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital."

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 80 of the Complaint.

81.    The Harley EM also states that Harley "relies exclusively on the money manager for the management of its investment portfolio. There could be adverse consequences to [Harley] in the event that the money manager ceases to be available to the Fund. The success of [Harley] is therefore expected to be significantly dependent upon the expertise and efforts of the money manager."

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 81 of the Complaint.

82.    Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006, and 2007 disclosed that BLMIS acted as Harley's "Custodian." Harley's audited financial statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 82 of the Complaint and therefore deny those

allegations.

83.    The Harley Subscription Agreements directed investors to wire their subscription payments for shares in Harley to certain bank accounts in New York. Prior to 2005, the Harley Subscription Agreements required subscription payments to be wired to a JPMorgan Chase Bank account in New York, held in the name of Fortis Bank (Cayman) Limited.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 83 of the Complaint.

84.    After 2005, the Harley Subscription Agreements required investors to wire subscriptions to a Northern Trust account in New York, held in the name of Fortis Prime Fund Solutions (IOM).

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 84 of the Complaint.

85.    Upon information and belief, CACEIS Bank Lux directed one or more payments for shares in Harley to one or both of these bank accounts in New York.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 85 of the Complaint.

86.    Upon execution of the Harley Subscription Agreement and investment in Harley, CACEIS Bank Lux was subject to Harley's Articles of Association, which establish that all disputes among Harley and its shareholders were referred to binding arbitration in New York pursuant to rules established by the American Arbitration Association.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 86 of the Complaint.

87.     New York City, New York was the specific situs selected by CACEIS Bank Lux for receipt of at least one redemption payment from Harley. Specifically, CACEIS Bank Lux used a correspondent bank account at JPMorgan Chase Bank in New York to receive such payment, which account was in CACEIS Bank Lux's own name.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 87 of the Complaint.

88.     Upon information and belief, CACEIS Bank Lux designated this New York-based bank in its Harley Subscription Agreements and/or relevant redemption documents. The receipt of transfers from Harley using JPMorgan Chase Bank in New York was purposeful on the part of CACEIS Bank Lux.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 88 of the Complaint.

89.     CACEIS Bank France and CACEIS Bank Lux directed funds to the Fairfield Funds on at least twenty-seven (27) occasions over the course of at least five (5) years.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 89 of the Complaint.

90.     Upon information and belief, CACEIS Bank Lux directed funds to Harley on at least one occasion over the course of at least five (5) years.

**ANSWER:** The CACEIS Entities deny the allegations in paragraph 90 of the Complaint.

91.     As a result of their investments with the New York-based BLMIS Feeder Funds, both CACEIS Bank France and CACEIS Bank Lux derived significant benefits from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** The allegations in paragraph 91 of the Complaint contain legal conclusions

to which no response is required. To the extent that a response is required, the CACEIS Entities

deny the allegations in paragraph 91.

92.     Both CACEIS Bank Lux and CACEIS Bank France transacted business in New York, and the Trustee's claims alleged herein arose from those business activities. CACEIS Bank Lux and CACEIS Bank France maintained minimum contacts and general business contacts with the United State and New York in connection with the Trustee's claims.

**ANSWER:** The allegations in paragraph 92 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 92.

93.     Both CACEIS Bank Lux and CACEIS Bank France should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER:** The allegations in paragraph 93 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 93.

## VI.   Recovery of Subsequent Transfers to the CACEIS Defendants

### A. Initial Transfers from BLMIS to Fairfield Sentry

94.     The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants, in the Bankruptcy Court, under the caption, *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**ANSWER:** The CACEIS Entities: (i) admit that the Trustee filed an action styled as *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro No. 09-01239 (BRL) (the "Sentry Action"); and (ii) lack knowledge or information sufficient to form a belief as to the truth of the allegation of the amounts of the transfers alleged in paragraph 94 and therefore deny such allegations. To the extent that any further response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 94 of the Complaint and therefore deny such allegations.

95.     By orders dated June 7 and June 10, 2011, this Court approved settlement among the Trustee, Fairfield Sentry, and others (the "Fairfield Sentry Agreement"), and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 (the "Judgment Amount") [ECF No. 109].

**ANSWER:** The CACEIS Entities admit, on information and belief, that the Court

entered orders and a judgment as described in paragraph 95 on or about the dates alleged therein,

and respectfully refer the Court to the referenced orders and the referenced judgment for the

complete and accurate contents thereof

96.    The Fairfield Sentry Initial Transfers are set forth in the attached **Exhibits C and D**. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**ANSWER:** The allegations in paragraph 96 of the Complaint contain legal conclusions

to which no response is required. To the extent that a response is required, the CACEIS Entities

lack knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 96 of the Complaint and therefore deny such allegations, except admit that Exhibits C

and D are attached to the Complaint.

97.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding (the "Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER:** The CACEIS Entities: (i) admit that the Trustee filed a Second Amended

Complaint in the Sentry Action; (ii) deny knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 97 and therefore deny those allegations, and

respectfully refer the Court to the referenced Second Amended Complaint for a complete and

accurate statement of its contents.

98.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of the fraud at BLMIS or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as though fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16, and 320-329.

**ANSWER:** The CACEIS Entities: (i) deny knowledge or information sufficient to form a belief as to the truth of the allegations in each and every paragraph of the Second Amended Complaint in the Sentry Action that allegedly support the claim that Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of the fraud at BLMIS, or at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud; and (ii) object to the incorporation by reference of, and therefore does not answer, each and every other paragraph and allegation in the Second Amended Complaint in the Sentry Action and to the inclusion in this adversary proceeding of any issue implicated by any of the Second Amended Complaint in the Sentry Action, but reserve the right to rely on and introduce any allegations in the referenced "Second Amended Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents. To the extent that any further response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 98 of the Complaint and therefore deny such allegations.

99.     Of the Fairfield Sentry Initial Transfers, BLMIS transferred $2,895,000,000 to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 99 and therefore deny such allegations. The remaining allegations in paragraph 99 contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 99.

100.     Of the Fairfield Sentry Six Year Transfers, BLMIS transferred at least $1,580,000,000 to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield

Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 100 and therefore deny such allegations. The remaining allegations in paragraph 100 contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 100.

### B. Subsequent Transfers from Fairfield Sentry to the CACEIS Defendants

101.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to CACEIS Bank France and CACEIS Bank Lux. Based on the Trustee's investigation to date, the subsequent transfers from Fairfield Sentry to CACEIS Bank France total $33,213,014 (the "Fairfield Sentry-CACEIS Bank France Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-CACEIS Bank France Subsequent Transfers is attached as **Exhibit E**. The subsequent transfers from Fairfield Sentry to CACEIS Bank Lux total $35,759,150 (the "Fairfield Sentry-CACEIS Bank Lux Subsequent Transfers" (and together with the Fairfield Sentry-CACEIS Bank France Subsequent Transfers, the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-CACEIS Bank Lux Subsequent Transfers is attached as **Exhibit F**.

**ANSWER:** The allegations in paragraph 101 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 of the Complaint and therefore deny such allegations. To the extent that paragraph 101 refers to a document, the CACEIS Entities respectfully refer the Court to that document for a complete and accurate statement of its contents, while denying the Trustee's allegations related to that document.

102.    On October 6, 2011, the Trustee filed this action seeking recovery of the Fairfield Sentry Subsequent Transfers.

**ANSWER:** The CACEIS Entities admit the Trustee filed this action seeking recovery of the alleged Fairfield Sentry Subsequent Transfers. The CACEIS Entities deny the remaining allegations in paragraph 102.

103.    The Fairfield Sentry Subsequent Transfers are recoverable from both CACEIS Bank France and CACEIS Bank Lux under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 103 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 103.

104.    The Fairfield Sentry Subsequent Transfers represent a redemption of equity interest by both CACEIS Bank France and CACEIS Bank Lux as shareholders in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Subsequent Transfers to CACEIS Bank France and CACEIS Bank Lux upon redemption of their interests.

**ANSWER:** The allegations in the second sentence of paragraph 104 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 104 and therefore deny those allegations. The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 104 and therefore deny those allegations.

105.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Fairfield Sentry Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 of the Complaint and therefore deny those allegations.

**C.  Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to CACEIS Bank Lux**

106.    Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 directly to Fairfield Sigma (the "Fairfield Sigma Subsequent Transfers" and together with the Fairfield Sentry Subsequent Transfers, the "Fairfield Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by date and amount is attached here as **Exhibit G**. Thereafter, Fairfield Sigma transferred at least $35,824,693 of the Fairfield Sigma Subsequent Transfers to CACEIS Bank Lux (the "Fairfield Sigma-CACEIS Bank Lux Subsequent Transfers"). A chart setting forth the Fairfield Sigma-CACEIS Bank Lux Subsequent Transfers is attached here as **Exhibit H**.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 of the Complaint and therefore deny such allegations. To the extent that paragraph 106 refers to a document, the CACEIS Entities respectfully refer the Court to that document for a complete and accurate statement of its contents, while denying the Trustee's allegations related to that document.

107.    On October 6, 2011, the Trustee filed this action seeking recovery of the Fairfield Sigma Subsequent Transfers.

**ANSWER:** The CACEIS Entities admit the Trustee filed this action seeking recovery of the alleged Fairfield Sigma Subsequent Transfers. The CACEIS Entities deny the remaining allegations in paragraph 107.

108.    The Fairfield Sigma Subsequent Transfers are recoverable from CACEIS Bank Lux under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 108 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 108.

109.    The Fairfield Sigma Subsequent Transfers represent a redemption of equity interest by CACEIS Bank Lux as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested 100% of its assets in Fairfield Sentry, and because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Subsequent Transfers to CACEIS Bank Lux upon redemption of its interests.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and therefore deny those allegations.

110.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Fairfield Sigma Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Complaint and therefore deny those allegations.

### D.  Initial Transfers from BLMIS to Harley

111.    The Trustee filed an adversary proceeding against Harley in the Bankruptcy Court styled *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of customer property from BLMIS to Harley in the amount of approximately $1,074,592,422 (the "Harley Complaint"). The Trustee incorporates by reference the allegations contained in the Harley Complaint as if fully set forth herein.

**ANSWER:** The CACEIS Entities: (i) admit that the Trustee filed an action styled as

*Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL) (the "Harley Action"); (ii)

lack knowledge or information sufficient to form a belief as to the truth of the allegation of the

amounts of the transfers alleged in paragraph 111 and therefore deny such allegations; (iii) deny

knowledge or information sufficient to form a belief as to the truth of the allegations in each and

every paragraph of the Harley Complaint; and (iv) object to the incorporation by reference of,

and therefore does not answer, each and every other paragraph and allegation in the Harley

Complaint in the Harley Action and to the inclusion in this adversary proceeding of any issue

implicated by any of the Harley Complaint in the Harley Action, but reserve the right to rely on

and introduce any allegations in the referenced "Harley Complaint" or its exhibits as opposing

party admissions admissible for the truth of their contents. To the extent that any further response

is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 111 of the Complaint and therefore deny such allegations.

112.    During the six years preceding the Filing Date, BLMIS made transfers to Harley of $1,072,800,000 (the "Harley Six-Year Initial Transfers"). The Harley Six-Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 112 and therefore deny such allegations. The remaining allegations in paragraph 112 contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 112.

113.    The Harley Six-Year Initial Transfers include $1,066,800,000 that BLMIS transferred to Harley during the two years preceding the Filing Date (the "Harley Two-Year Initial Transfers"). The Harley Two-Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 113 and therefore deny such allegations. The remaining allegations in paragraph 113 contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 113.

114.    The Harley Six-Year Initial Transfers and the Harley Two-Year Initial Transfers are collectively referred to as the "Harley Initial Transfers. Charts setting forth these transfers are attached as **Exhibits I and J.**

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114 of the Complaint and therefore deny

such allegations. To the extent that paragraph 114 refers to a document, the CACEIS Entities

respectfully refer the Court to that document for a complete and accurate statement of its

contents, while denying the Trustee's allegations related to that document.

115.    On November 10, 2010, the Bankruptcy Court entered default and summary
judgment against Harley in the amount of $1,072,820,000, noting that the initial transfers from
BLMIS to Harley were avoidable. Of this amount, $1,066,800,000 was awarded in a default
summary judgment against Harley. The Trustee has not recovered any monies as result of this
judgment.

**ANSWER:** The CACEIS Entities admit, on information and belief, that the Court

entered a judgment as described in paragraph 115 on or about the date alleged therein, and

respectfully refer the Court to the referenced order and the referenced judgment for the complete

and accurate contents thereof. The CACEIS entities deny knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 115 of the Complaint and

therefore deny such allegations.

### E.  Subsequent Transfers from Harley to CACEIS Bank Lux

116.    Prior to the Filing Date, Harley subsequently transferred a portion of the Harley
Initial Transfers to CACEIS Bank Lux. Based on the Trustee's investigation to date, the
subsequent transfers from Harley to CACEIS Bank Lux total $6,049,960 (the "Harley
Subsequent Transfers"). A chart setting forth the presently known Harley Subsequent Transfers
is attached as **Exhibit K**.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 116 of the Complaint and therefore deny

such allegations. To the extent that paragraph 116 refers to a document, the CACEIS Entities

respectfully refer the Court to that document for a complete and accurate statement of its

contents, while denying the Trustee's allegations related to that document.

117.    On October 6, 2011, the Trustee filed this action seeking recovery of the Harley
Subsequent Transfers.

**ANSWER:** The CACEIS Entities admit the Trustee filed this action seeking recovery of the alleged Harley Subsequent Transfers. The CACEIS Entities deny the remaining allegations in paragraph 117.

118.    The Harley Subsequent Transfers are recoverable from CACEIS Bank Lux under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 118 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 118.

119.    The Harley Subsequent Transfers represent a redemption of equity interest by CACEIS Bank Lux as a shareholder in Harley. Because Harley invested all or substantially all of its assets into the BLMIS Ponzi scheme, Harley was insolvent when it made the Harley Subsequent Transfers to CACEIS Bank Lux upon redemption of their interests.

**ANSWER:** The allegations in the second sentence of paragraph 119 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 119 and therefore deny those allegations. The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 119 and therefore deny those allegations.

120.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Harley Initial Transfers, Harley Subsequent Transfers, and any additional transfers; and (ii) seek recovery of such additional transfers.

**ANSWER:** The CACEIS Entities deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120 of the Complaint and therefore deny those allegations.

<u>**COUNT ONE**</u>
<u>**RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –**</u>
<u>**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**</u>

121.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten here.

**ANSWER:** The CACEIS Entities incorporate by reference and reassert as if fully set forth herein their responses to the allegations of the Complaint contained in each of the previous paragraphs of this Answer.

122.    The Fairfield Sentry Subsequent Transfers are recoverable from both CACEIS Bank France and CACEIS Bank Lux (as applicable to each Defendant).

**ANSWER:** The allegations in paragraph 122 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 122.

123.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to CACEIS BANK France or CACEIS Bank Lux.

**ANSWER:** The allegations in paragraph 123 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 123.

124.    Both CACEIS Bank France and CACEIS Bank Lux are immediate or mediate transferees of the Fairfield Sentry Subsequent Transfers.

**ANSWER:** The allegations in paragraph 124 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 124.

125.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against CACEIS Bank France and CACEIS Bank Lux: (a) recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, from CACEIS Bank France and CACEIS Bank Lux for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:** The allegations in paragraph 125 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 125.

<u>COUNT TWO</u>
<u>RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS –</u>
<u>11 U.S.C. §§ 550 AND 551 AND NYDCL § 278</u>

126.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten here.

**ANSWER:** The CACEIS Entities incorporate by reference and reassert as if fully set forth herein their responses to the allegations of the Complaint contained in each of the previous paragraphs of this Answer.

127.     The Fairfield Sigma Subsequent Transfers are recoverable from CACEIS Bank Lux.

**ANSWER:** The allegations in paragraph 127 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 127.

128.     Each of the Fairfield Sigma Subsequent Transfers was made directly or indirectly to CACEIS Bank Lux.

**ANSWER:** The allegations in paragraph 128 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 128.

129.     CACEIS Bank Lux is an immediate or mediate transferee of the Fairfield Sigma Subsequent Transfers from Fairfield Sigma.

**ANSWER:** The allegations in paragraph 129 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 129.

130.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against CACEIS Bank Lux: (a) recovering the Fairfield Sigma Subsequent Transfers, or the value thereof, from CACEIS Bank Lux for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

38

**ANSWER:** The allegations in paragraph 130 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 130.

**COUNT THREE**
**RECOVERY OF HARLEY SUBSEQUENT TRANSFERS –**
**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

131.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten here.

**ANSWER:** The CACEIS Entities incorporate by reference and reassert as if fully set forth herein their responses to the allegations of the Complaint contained in each of the previous paragraphs of this Answer.

132.    Each of the Harley Subsequent Transfers is recoverable from CACEIS Bank Lux under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 132 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 132.

133.    Each of the Harley Subsequent Transfers was made directly or indirectly to CACEIS Bank Lux.

**ANSWER:** The allegations in paragraph 133 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 133.

134.    CACEIS Bank Lux is an immediate or mediate transferee of the Harley Subsequent Transfers from Harley.

**ANSWER:** The allegations in paragraph 134 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 134.

135.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against CACEIS Bank Lux: (a) recovering the Harley Subsequent Transfers, or the value thereof, from CACEIS Bank Lux for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:** The allegations in paragraph 135 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny the allegations in paragraph 135.

## RESPONSE TO REQUEST FOR RELIEF

The Request for Relief sets forth legal conclusions to which no response is required. To the extent that a response is required, the CACEIS Entities deny that the Trustee is entitled to his requested relief or to any other relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

### 11 U.S.C. § 546(e) – Bankruptcy Code Safe Harbor

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry Initial Transfers or Harley Initial Transfers, or pursue under 11 U.S.C. § 550(a) any recovery claims against the CACEIS Entities premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial Transfers or Harley Initial Transfers, except to the extent that the Trustee can establish that such transfers were made with actual intent to defraud within two years before the Filing Date. Thus, the Trustee may neither avoid the alleged Fairfield Sentry Initial Transfers nor the alleged Harley Initial Transfers relevant to the CACEIS Entities nor maintain alleged claims for recovery against the CACEIS Entities because: (i) the relevant transfers were settlement payments and/or transfers made "in connection with . . . securities contract[s]," 11 U.S.C. § 546(e), (ii) any relevant transfers were made by BLMIS in response to Fairfield Sentry's or Harley's requests for withdrawals; and (iii) the alleged Fairfield Sentry Initial

Transfers and Harley Initial Transfers were made by, to, and for the benefit of entities covered by 11 U.S.C. § 546(e). The CACEIS Entities had no actual knowledge that BLMIS was not trading securities or was perpetrating a fraud or a Ponzi scheme, and the CACEIS Entities allegedly took any funds received from Fairfield Sentry or Harley for value and in good faith. Because the alleged transfers are not avoidable, property allegedly received by the CACEIS Entities as part of the alleged Fairfield Sentry Initial Transfers or Harley Initial Transfers, if any, is not recoverable from the CACEIS Entities.

## Second Affirmative Defense

## Not Customer Property

The property, if any, that the CACEIS Entities allegedly received from Fairfield Sentry, Fairfield Sigma, and Harley was not customer property of BLMIS or proceeds of customer property that BLMIS allegedly transferred to Fairfield Sentry, Fairfield Sigma, or Harley. For reasons including those set forth in the CACEIS Entities' Memorandum of Law in Support of the Motion to Dismiss, ECF 135, filed on September 13, 2023 in this adversary proceeding, many of the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers could not have been sourced from BLMIS customer property because prior allegedly avoidable transfers from BLMIS to Fairfield Sentry, Fairfield Sigma and Harley had been distributed by Fairfield Sentry, Fairfield Sigma and Harley to other entities prior to the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers and Harley Subsequent Transfers. Thus, alleged transfers from Fairfield Sentry, Fairfield Sigma and Harley to the CACEIS Entities are not recoverable by the Trustee.

### Third Affirmative Defense

### Proceeds Not Recoverable

In the alternative, to the extent that the property, if any, that the CACEIS Entities allegedly received from Fairfield Sentry, Fairfield Sigma or Harley was BLMIS customer property or proceeds thereof, it is not recoverable by the Trustee from the CACEIS Entities under section 550(a)(2) of the Bankruptcy Code.

### Fourth Affirmative Defense

### Double Recovery

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds in the Sentry Action. This Court in the Sentry Action approved the Fairfield Settlement Agreement on June 7, 2011, and it was incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011 (the "Consent Judgment"). The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry transferred. To the extent that the Liquidators recover from the CACEIS Entities in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should the CACEIS Entities be subject to recovery of identical funds from two separate entities.

### Fifth Affirmative Defense

### Mere Conduit/Lack of Dominion or Control

The Trustee's claims are barred under the "mere conduit" defense, because the CACEIS Entities were not transferees of the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers. *See Finley v. Alexander &*

*Alexander of N.Y. Inc. (In re Finley)*, 130 F.3d 52, 57–58 (2d Cir. 1997); *Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc. (In re Warnaco Group, Inc.),* No. 03 Civ. 4201 (DAB), 2006 U.S. Dist. LEXIS 4263, at *18-19 (S.D.N.Y. Jan. 31, 2006). To the extent that CACEIS Entities received any alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, or Harley Subsequent Transfers, the CACEIS Entities: (i) received each alleged Fairfield Sentry Subsequent Transfer, Fairfield Sigma Subsequent Transfer, and Harley Subsequent Transfer in good faith, in a nominee capacity, and for the account and benefit of one or more of their customers; (ii) did not have dominion or control or the right to assert dominion or control over the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers, or the proceeds thereof or to use the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers or the proceeds thereof for its own purposes; (iii) was a mere conduit for their customers; and (iv) was obligated to credit the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers to the account and for the benefit of one or more of their customers, who alone had the right to assert dominion and control over the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers allegedly received by the CACEIS Entities for their benefit. Therefore, to the extent that the CACEIS Entities received any alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, and Harley Subsequent Transfers, or proceeds thereof, they did so as a mere conduit for third parties rather than as transferees from which the Trustee may recover under 11 U.S.C. § 550(a).

**Sixth Affirmative Defense**

**The CACEIS Entities as Initial Transferees – Mere Conduit/Lack of Dominion or Control**

In the alternative, Fairfield Sentry, Fairfield Sigma and Harley were mere conduits, and consequently, any claimed transfers were initial transfers from BLMIS to the CACEIS Entities. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, Fairfield Sentry's "sole purpose was to funnel money to BLMIS," Trustee's Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Compl. at 3, *Picard v. Grosvenor Inv. Mgmt. Ltd.*, No. 12-01021 (Bankr. S.D.N.Y. June 15, 2022), ECF 115, and "no arm's length relationship exist[ed] between [Sentry] and BLMIS." *Id.* at 6 (internal quotation marks and citation omitted). Any redemptions allegedly received by the CACEIS Entities were initial transfers from BLMIS to the CACEIS Entities that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the alleged transfers is untimely; and the CACEIS Entities may retain the amount they allegedly received, if any, pursuant to 11 U.S.C. §§ 548(c) and 548(d)(2)(B) because they took any alleged transfers for value and in good faith.

**Seventh Affirmative Defense**

**11 U.S.C. § 550(d) – Single Satisfaction and N.Y. Debt. & Cred. Law § 278(1)(a)**

Under 11 U.S.C. § 550(d), "[t]he [T]rustee is entitled to only a single satisfaction under [11 U.S.C. § 550(a)]." Under N.Y. Debt. & Cred. Law § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim." N.Y. Debt. & Cred. Law § 78(1)(a) (McKinney 2020).[4] Accordingly, the Trustee may not recover any alleged subsequent

---

[4] N.Y. Debt. & Cred. Law § 278 was amended pursuant to New York's adoption of the Uniform Voidable Transactions Act ("UVTA"), effective April 4, 2020. However, the law implementing those revisions provides that they "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date." 2019 N.Y. Laws Ch. 580, § 7. Because all of the alleged

transfer allegedly received by the CACEIS Entities to the extent that the Trustee has recovered,

or will recover, from Fairfield Sentry, Fairfield Sigma, or Harley or any other immediate or

mediate transferee, the amount of an allegedly avoided initial transfer that included the customer

property that the Trustee alleges that the CACEIS Entities received.

**Eighth Affirmative Defense**

**11 U.S.C. 550(b) and N.Y. Debt. & Cred. Law 278(1), 278(2) – Value, Good Faith,
and Without Knowledge of Voidability**

To the extent that the CACEIS Entities allegedly received any alleged Fairfield Sentry

Subsequent Transfer, Fairfield Sigma Subsequent Transfer, or Harley Subsequent Transfer, or

any proceeds thereof, such property or funds may not be recovered because the CACEIS Entities

allegedly took for value, in good faith, and without knowledge of the avoidability of any transfer

within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration without

knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning

of N.Y. Debt. & Cred. Law §§ 278(1) and 278(2).

To the extent that the CACEIS Entities received any alleged Fairfield Sentry Subsequent

Transfer, Fairfield Sigma Subsequent Transfer, or Harley Subsequent Transfer, the CACEIS

Entities took in good faith because they lacked knowledge that BLMIS was not trading securities

or was perpetrating a fraud or a Ponzi scheme, or of any fraudulent purpose behind the alleged

Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, or Harley

Subsequent Transfers. The CACEIS Entities lacked knowledge of the voidability of any alleged

Fairfield Sentry Initial Transfers and Harley Initial Transfers at the time they allegedly received

transfers at issue took place, and/or any alleged right of action relating to the alleged transfers accrued, prior to the
UVTA's enactment, this Answer cites to the version of § 278 in effect prior to the April 4, 2020 revisions.

45

any alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, or
Harley Subsequent Transfers. The CACEIS Entities lacked actual fraudulent intent at the time
they allegedly received any alleged Fairfield Sentry Subsequent Transfer, Fairfield Sigma
Subsequent Transfer, or Harley Subsequent Transfer. The CACEIS Entities lacked knowledge of
facts suggestive of any alleged fraud that would have caused a reasonable person in their position
to conduct further inquiry into BLMIS about any possible fraud.

Any alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent
Transfers, or Harley Subsequent Transfers received by the CACEIS Entities were routine
transfers made by Fairfield Sentry, Fairfield Sigma, Harley, taken for value, in exchange for
redemptions of investments in Fairfield Sentry, Fairfield Sigma or Harley, and did not have a
fraudulent purpose. Any such alleged exchange was also for fair consideration, as a surrender of
shares in Fairfield Sentry, Fairfield Sigma, or Harley, and constituted a fair equivalent of the
alleged property received.

Moreover, a reasonable person with the facts in the CACEIS Entities' possession at the
time of the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers,
or Harley Subsequent Transfers would not have been on inquiry notice of any fraudulent purpose
behind the alleged Fairfield Sentry Initial Transfers or Harley Initial Transfers, nor would those
facts have led such a person to conduct further inquiry into whether there was a fraudulent
purpose to them, into whether BLMIS was trading securities, or into whether they related to a
fraud or a Ponzi scheme. Even if the CACEIS Entities had been on inquiry notice of a possible
fraudulent purpose behind the alleged Fairfield Sentry Initial Transfers or Harley Initial
Transfers or of facts that would have led a reasonable person to conduct further inquiry into
whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by

46

the CACEIS Entities would not have discovered the allegedly fraudulent purpose of any transfer or that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with vastly greater investigatory tools and resources than the CACEIS Entities, and with more access to BLMIS personnel and documentation than the CACEIS Entities, investigated BLMIS but failed to uncover that it was a Ponzi scheme prior to December 2008.

Additionally, the CACEIS Entities did not have knowledge of the alleged voidability of the alleged Fairfield Sentry Initial Transfers or Harley Initial Transfers at the time of the alleged Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers, or Harley Subsequent Transfers.

## Ninth Affirmative Defense

### Extraterritoriality

The Trustee's recovery from the CACEIS Entities of any alleged transfer from Fairfield Sentry, Fairfield Sigma, or Harley would constitute an impermissible extraterritorial application of U.S. law.

## Tenth Affirmative Defense

### Comity

The Trustee's recovery from the CACEIS Entities of any alleged transfer from Fairfield Sentry, Fairfield Sigma, or Harley would violate principles of comity.

## Eleventh Affirmative Defense

### No Interest

The Trustee is not entitled to an award of interest.

**Twelfth Affirmative Defense**

**Lack of Subject Matter Jurisdiction**
**(U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))**

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final

orders or judgments in this proceeding.

**Thirteenth Affirmative Defense**

**Statute of Limitations**

The Trustee's claims are barred by the statute of limitations.

**Fourteenth Affirmative Defense**

**Preservation of Rights (11 U.S.C. § 502(h))**

To the extent that the Trustee recovers from the CACEIS Entities, the CACEIS Entities

reserve their right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

**Fifteenth Affirmative Defense**

**Failure to Mitigate**

The Trustee's claims are barred, in whole or in part, because the Trustee has failed to

mitigate, minimize, or avoid damages, if any.

**Sixteenth Affirmative Defense**

**Unreasonable Delay / Laches, Equitable Estoppel, Waiver**

The Trustee's claims against the CACEIS Entities are barred, in whole or in part, by the

doctrine of laches, equitable estoppel, waiver, or other related equitable doctrines.

**Seventeenth Affirmative Defense**

**Failure to State a Claim for Relief**

The Complaint fails to state a claim upon which relief can be granted, including, without

limitation, for each of the reasons stated in the CACEIS Entities' Memorandum of Law in Support of the Motion to Dismiss the Complaint, filed on September 13, 2023 in this adversary proceeding, ECF 135, and proceedings thereon.

### Eighteenth Affirmative Defense

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee may not recover the alleged transfers from Fairfield Sentry, Fairfield Sigma, or Harley to the CACEIS Entities, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry or Harley.

### Nineteenth Affirmative Defense

### Sufficient SIPC Funds

The Trustee's claims should be dismissed if the Trustee has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

### Twentieth Affirmative Defense

### British Virgin Island Proceedings

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

### Twenty First Affirmative Defense

### No Ponzi Scheme Presumption

The Trustee's claims are barred, in whole or in part, because the Trustee may not rely on a Ponzi scheme presumption to prove that the alleged transfers from Fairfield Sentry, Fairfield

Sigma or Harley that he seeks to recover from the CACEIS Entities were made with actual intent to hinder, delay, or defraud any BLMIS creditor.

### Twenty Second Affirmative Defense

### Violation of Due Process (U.S. Const. Amend. V)

The use of the doctrine of law of the case to apply to the CACEIS Entities rulings made in other adversary proceedings to which they were not a party and in which they did not participate violates the CACEIS Entities' right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

### Twenty Third Affirmative Defense

### Indemnification

The CACEIS Entities are entitled to recover indemnity and/or contribution from others for any liability they incur to the Trustee.

### Twenty Fourth Affirmative Defense

### *In Pari Delicto*

The Trustee's claims against the CACEIS Entities are barred by the doctrine of *in pari delicto*, because a trustee, standing in the shoes of the debtor, cannot recover for a wrong that the debtor itself took part in.

### Twenty Fifth Affirmative Defense

### New York Debtor and Creditor Law (N.Y. Debt & Cred §§ 273-79; 11 U.S.C. § 544)

The claims against the CACEIS Entities are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

### Twenty Sixth Affirmative Defense

### Dismissed Claims

The Trustee's claims are barred to the extent that they and/or any allegations on which they are based have been or may in the future be dismissed or stricken by the Court, or are based on theories or allegations that may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

### Twenty Seventh Affirmative Defense

### No Standing

Plaintiff's claims are barred, in whole or in part, because Plaintiff and/or the Debtor lacks standing to assert the claims alleged in this action.

### Twenty Eighth Affirmative Defense

### Rights Reserved

Answers to each Paragraph of the Complaint are made by the CACEIS Entities without waiving, but expressly reserving, all rights they may have to seek relief by appropriate motions directed to the allegations in the Complaint.

### Twenty Ninth Affirmative Defense

### Additional Defenses

The CACEIS Entities have insufficient knowledge or information upon which to form a belief as to whether they may have additional yet unstated defenses. The CACEIS Entities reserve the right to assert any additional defenses as may be discovered during the conduct of this litigation.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this

proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, the CACEIS Entities

hereby demand a jury trial on all claims and issues that may be tried to a jury.

**STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(B)**

The CACEIS Entities object and do not consent to the entry of final orders or

judgments against the CACEIS Entities by the Bankruptcy Court.

**DEFENDANTS' REQUEST FOR RELIEF**

WHEREFORE, the CACEIS Entities request judgment dismissing the Complaint with

prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief

as the Court deems just and appropriate.


Dated: April 10, 2024
      New York, New York

                                    Respectfully submitted,

                                    */s/ Daniel Schimmel*
                                    Daniel Schimmel
                                    Shrutih Tewarie
                                    Amanda S. Coleman
                                    FOLEY HOAG LLP
                                    1301 Avenue of the Americas
                                    New York, NY 10019
                                    (212) 812-0400
                                    dschimmel@foleyhoag.com
                                    stewarie@foleyhoag.com
                                    acoleman@foleyhoag.com

                                    *Attorneys for CACEIS Bank and CACEIS Bank,*
                                    *Luxembourg Branch*